IN THE CIRCUIT COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

# CASE NO: 23-11061-D

---

UNITED STATES OF AMERICA,

Plaintiff/ Appelle,

vs.

JOAN MANUEL ESTADELLA,

Defendant/Appellant.

---

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

**INITIAL BRIEF OF APPELLANT**

---

**Encinosa Law, P.A**.
ISRAEL JOSE ENCINOSA, ESQ.
F.B.N. 435007
8950 SW 74th Court, Ste. 2201
Miami, Fl 33156-3181
Tel. (305) 804-6976
Fax.(305) 203-4707
E-mail: encilaw@aol.com
        encinosalaw@reagan.com

COUNSEL FOR APPELLANT

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL )

## APPELLANT'S NOTICE CONCERNING CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(c), the Appellant hereby advises that the Certificate of Interested Persons and Corporate Disclosure Statement required by Rule 26.1-2(a) has now been filed and the following is a complete list of all persons and entities that the Appellant believes to have an interest in the outcome of the case, as required by 11th Cir. R. 26.1-1:

Altman, Hon. Roy K.

Bacerra, Hon. Jacqueline

Caruso, Michael, (FPD)

Castro, Monica (AUSA)

Charest-Turken, Gabrielle Raemy (AUSA)

Childs Jr., Shaeaun Lenard (Victim)

De Armas, Juan Carlos (Initial Suspect)

Ecarius, Daniel (AFPD)

Egozi, Joseph (AUSA)

Encinosa Law, P.A.

Encinosa, Israel Jose (Defendant's Attorney)

Estadella, Joan Manuel (Defendant)

Gardea Jr., Eduardo (AUSA)

Gonzalez, Juan Antonio (Acting USA)

Herbella Almaguer, Aglays (Victim)

LaPointe, Markenzy (USA)

Maldonado Jr., Mauricio Enrique (Suspect)

Matzkin, Daniel (AUSA)

Torres, Hon.Edwin G.

O'Sullivan, Hon. John J.

Samabria, Anthony (Victim)

Sardinas, Nataley Giselle (Victim)

By: /s/ *Israel Jose Encinosa*
      Israel Jose Encinosa, Esq.,
      F.B.N. 435007

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully submits that oral argument will aid this Court's decision-making process by giving the parties the chance to articulate the arguments made in their briefs, to discuss the applicability of precedents found or decided after the briefs are submitted.

## STATEMENT REGARDING PREFERENCE

This is a criminal case on direct appeal from a final decision of the United States District Court for the Southern District of Florida. This case is entitled to preference pursuant to Federal Rule of Appellate Procedure 45(b) because the Appellant, Joan Manuel Estadella**,** was convicted and is currently serving a term of imprisonment of **96** months at Petersburg Medium FCI.

## Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Typestyle requirements

1. This brief contains **12,986** words, excluding the parts of the brief exempted by Rule 32(f), Fed. R. App. P., and therefore complies with the type-volume limitations of Rule 32(a)(7)(B)(i).

2. This brief has been prepared with a proportionally spaced typeface using Times New Roman in 14-point font and therefore complies with the typeface and typestyle requirements of Rules 32(a)(5)&(a)(6).

By: /s/*Israel Jose Encinosa*

Israel Jose Encinosa, Esq.

## TABLE OF CONTENTS

Page:

Certificate of Interested Persons………..………….…………………. C-1

Statement Regarding Oral Argument………….……………………….. i

Statement Regarding Preference……………………….………….…….. i

Certificate of Compliance………………………………….…………… i

Table of Contents...………………………………………………………. ii

Table of Citations………………………………………………………….. iv

Abbreviations…………………………………………………………… xii

Statement of Subject Matter & Appellate Jurisdiction……………........ xiii

Statement of Issues……………………………………………………… 1

Standard of Review……………………………………………………….. 3

Summary of the Arguments…………………………………………….. 6

Course of Proceedings and Disposition in Court Below……………….. 9

Statement of the Facts……………………………………………….….. 12

Argument-1 ………………………………………………………………. 23

Argument-2 ………………………………………………………………. 31

Argument-3 ………………………………………………………………. 37

Argument-4 ………………………………………………………………... 41

Argument-5 ………………………………………………………………... 46

Argument-6 ................................................................................. 57

Conclusion……………………………………………………… 58

Certificate of Service……………………………………………….. 60

# TABLE OF CITATIONS

Cases                                                                      Page

*Georgia v. Randolph,*

126 S. Ct. 1515, 1520 (2006)……………………………………….. 26, 27, 28

*Holmes v. South Carolina,*

547 U.S. 319 (2006)…………………………………………………. 38

*Huddleston v. United States,*

485 U.S. 681 (1988)………………………………………………… 57

*Illinois v. Rodriguez,*

497 U.S. 177, 181 (1990)…………………………………………. 26, 27, 30

*Katz v. United States,*

389 U.S. 347, 357 (1967)……………………………………….. 26

*Krane v. Kentucky,*

476 U.S. 683, 690 (1986)……………………………………….. 38

*McWhorter v. United States,*

193 F.2d 982, 985 (5th Cir. 1952)……………………………… 36

*Mesa v. United States,*

108 S.Ct. 2022, 100 L.Ed.2d 609 (1988)………………………….. 39

*Morris v. Sec'y. Dep't. of Corr.,*

677 F.3d 1117, 1132 (11th Cir 2012)…………………………….. 58

*Solis v. United States*,

473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985)………………… 39

*Stoner v. California*,

376 U.S. 483 (1964)………………………………………………….. 30

*Terry v. Ohio*,

392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)……….. 30

*United States v. Baker*,

432 F.3d 1189,1223 (11th Cir. 2005)…………………………………… 5

*United States v. Beechum*,

582 F.2d 898, 911 (5th Cir. 1978) (*en banc*)……………………….. 55, 57

*United States v. Boyce*,

351 F.3d 1102, 1105 (11th Cir. 2003)…………………………………… 3

*United States v. Cabrera*,

567 F. Supp. 2d 271, 271 (D. Mass. 2008)………………………….. 45

*United States v. Capers*,

708 F.3d 1286 (11th Cir. 2013)…………………………………………… 4

*United States v. Carrillo*,

440 F. Supp. 3d 1148, 1157 (E.D. Cal. 2020)…………………………….. 45

*United States v. Chase,*

838 F.2d 743, 749 (5th Cir.)……………………………………….. 39

*United States v. Cohen,*

888 F.2d 770, 776 (11th Cir.1989)……………………………… 55

*United States v. Diaz*,

No. 11-CR-821-2(JG), 2013 WL 322243, (E.D.N.Y. Jan. 28, 2013)…… 45

*United States v. Eckhardt*,

466 F.3d 938, 946 (11th Cir. 2006)……………………………… 5

*United States v. Foster,*

155 F.3d 1329, 1331 (11th Cir.1998)……………………………….. 4

*United States v. Foster,*

874 F.2d 491, at 495 (8th Cir. 1998)………………………………. 56

*United States v. Frazier*,

387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)………………………… 5

*United States v. Friske*,

640 F.3d 1288, 1290–91(11th Cir.2011)………………………… 3

*United States v. Hartle*,

No. 4:16-CV-233-BLW, 2017 WL 2608221 (D. Idaho June 15, 2017)…. 44

*United States v. Hayes*,

948 F. Supp. 2d 1009, 1025 (N.D. Iowa 2013)………………………….. 42, 45

*United States v. Hernandez*,

743 F.3d 812, 814 (11th Cir. 2014)……………………………………… 32

*United States v. Herrera*,

931 F.2d 761, 762 (11th Cir.1991)……………………………….. 3

*United States v. Ibarra-Sandoval*,

265 F. Supp. 3d 1249, 1255 (D.N.M. 2017)……………………… 45

*United States v. Jackson*,

426 F.2d 305, 309 (5th Cir. 1970)……………………………… 36

*United States v. Johnson*,

379 F. Supp. 3d 1213, 1223-24 (M.D. Ala. 2019)……………………… 44

*United States v. Kelly*,

749 F.2d 1541 (11th Cir)…………………………………….. 36

*United States v. Klopf*,

423 F.3d 1228 (11th Cir. 2005)……………………………… 36

*United States v. Lange*,

528 F.2d 1280, 1287 (5th Cir. 1976)……………………………… 36

*United States v. Matlock*,

415 U.S. 164 (1974)……………………………………… 26, 27, 29

*United States v. McLean*,

138 F.3d 1398 (11th Cir. 1998)………………………………………… 49

*United States v. Mendez*,

528 F.3d 811, 814 (11th Cir. 2008)…………………………………… 4

*United States v. Nawanna*,

321 F. Supp. 3d 943 (N.D. Iowa 2018)………………………………… 44, 45

*United States v. Obregon*

893 F.2d 1307, 1310 (11th Cir. 1990)………………………………….. 4

*United States v. Perez-Tosta*,

36 F.3d 1552, 1557 (11th Cir.1994)…………………………………… 36

*United States v. Poole*,

878 F.2d 1389, 1391 (11th Cir.1989)………………………………… 3

*United States v. Ramirez,*

426 F.3d 1344, 1354 (11th Cir. 2005)………………………………… 55

*United States v. Ramsdale*,

61 F.3d 825, 829 (11th Cir.1995)……………………………………… 49

*United States v. Reeves,*

742 F.3d 487*, 505* (11th Cir. 2014)…………………………………… 57, 58

*United States v. Tementa Robinson*,

Cause No.: 3:21-CR-14-CWR-FKB- 2…………………………… 41, 42, 43, 44

*United States v. Ross*,

131 F.3d 970, 987 (11th Cir.1997)……………………………………… 48

*United States v. Saenz*,

747 F.2d 930, 942 (5th Cir. 1984)……………………………………… 39

*United 54 States v. Stephens*,

365 F.3d 967, 975 (11th Cir.2004)……………………………………… 55

*United States v. White*,

569 F.2d 263 (5th Cir. 1978)…………………………………………….. 36

*United States v. White,*

335 F.3d 1314, 1317 (11th Cir. 2003)……………………………………  4

*United States v. Williford*,

764 F.2d 1493, 1499 (11th Cir. 1985)……………………………………  49

*United States v. Young*,

470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)……………..  39

<u>United States Constitution</u>

Fifth Amendment Due Process Clause……………………….2, 8, 38, 56, 58

Fourth Amendment…………………………………………………… 26

Sixth Amendment Right to a Fair Trial…………………………… 5, 8, 57

Sixth Amendment Compulsory Clause………………………………….. 38

Sixth Amendment………………………………………………….. 38, 58

Statutes and Other Authorities

18 U.S.C. § 922(g)(1)………………………………………… 9

18 U.S.C. § 924(a)(2)………………………………………… 9

18 U.S.C. § 924(c)(1)(A)(i)………………………………… 9

18 U.S.C. § 3231…………………………………………….. v

18 U.S.C. § 3742(a)(1)……………………………………… v

21 U.S.C. § 841(a)(1)………………………………………. 9

21 U.S.C. § 841(b)(1)(B)(viii)…………………………….. 45

28 U.S.C. § 1291……………………………………………. v

Federal Rule of Appellate Procedure 32(a)(5)&(a)(6)…………………. i

Federal Rule of Appellate Procedure 32 (a) (7) (C)……………………. i

Federal Rule of Appellate Procedure 32 (f)…………………………… i

Federal Rule of Appellate Procedure 45(b)…………………………… i

Federal Rule of Criminal Procedure 29………………………… 1, 3, 7, 31

Federal Rule of Evidence 404(b)…………. 2, 8, 9, 46, 47, 48, 49, 53, 54, 55, 56

U.S.S.G. § 2D1.1 cmt. n.27(C)…………………………….. 42

U.S.S.G. § 2D1.1(c)(7)……………………………………… 2, 8, 41

U.S.S.G. § 2D1.1(c)(11)……………………………………. 2, 8, 41

11th Cir. R. 26.1-1……………………………………………… C-1 of 2

11th Cir. R. 26.1-2(a)……………………………………………… C 1of 2

11th Cir. R. 26.1-2(c)……………………………………………… C 1 of 2

## ABBREVIATIONS

As used herein the symbol "DE" is use to denote reference to the "Docket Entry," as listed in the Docket Sheet. The symbol "MHT" is used to denote reference to the transcript of the "Motion *In Limine* Hearing", which is also Docket Entry-192, followed by the page number and line number. The symbol "MST1" is used to denote reference to the transcript of Day-1 of the "Motion to Suppress Hearing," which is also Docket Entry-127, followed by the page number and line number. The symbol "MST2" is used to denote reference to the transcript of Day-2 of the Motion to Suppress hearing; which is also Docket Entry-128, followed by the page number and line number. The symbol "TT1" is used to denote reference to the Trial Transcript of Day-1, which is also Docket Entry-180, followed by the page number and lines number. The symbol "TT2" is used to denote reference to the Trial Transcript of Day-2, which is also Docket Entry-181, followed by the page number and Line number. The symbol "TT3" is used to denote reference to the Trial Transcript of Day-3, which is also Docket Entry-182, followed by the page number and line number. The symbol "TT4" is used to denote reference to the Trial Transcript of Day-4, which is also Docket Entry-183, followed by the page number and line number. The symbol "ST" is used to denote reference to the Sentencing Hearing Transcript; which is also Docket Entry 184, followed by the page number and line number.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The District Court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the Appellant was charged with an offense against the laws of the United States. This Court has jurisdiction over this criminal appeal by virtue of 28 U.S.C. § 1291, which provides that the Courts of Appeals have jurisdiction to hear appeals from all final decisions of the United States District Courts. In addition, the courts have jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) to consider a claim that a sentence was imposed in violation of law. The Appellant was found guilty and was sentenced to a prison term of 96 months on March 29,2023.[DE:168] The Appellant is currently serving his sentence.

## STATEMENT OF THE ARGUMENTS

### ARGUMENT-1

THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE

### ARGUMENT-2

THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT'S RULE 29 MOTION AS TO COUNT-3 OF THE INDICTMENT

### ARGUMENT-3

THE DISTRICT COURT ERRED BY FAILING TO SUSTAIN APPELLANT'S OBJECTION TO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

### ARGUMENT-4

THE DISTRICT COURT ERRED BY OVERRULING APPELLANT'S OBJECTION TO PARAGRAPH 23 OF THE PRESENTENCE INVESTIGATION REPORT AND BY SENTENCING APPELLANT AT A BASE OFFENSE

LEVEL OF 26 PURSUANT TO U.S.S.G. § 2D1.1(c)(7)

INSTEAD OF A BASE OFFENSE LEVEL OF 18

PURSUANT TO U.S.S.G. § 2D1.1(c)(11)

## ARGUMENT-5

THE DISTRICT COURT ERRED BY GRANTING IN

PART THE GOVERNMENT'S OMNIBUS MOTION *IN*

*LIMINE* TO ADMIT INTRINSIC AND EXTRINSIC

EVIDENCE AND RELATED NOTICES UNDER RULE

404(b)

## ARGUMENT-6

THE CUMULATIVE EFFECT OF THE ERRORS

DENIED APPELLANT HIS DUE PROCESS RIGHT TO A

TRIAL THAT WAS FAIR

## STANDARD OF REVIEW

### ARGUMENT-1
### (Denial of Motion to Suppress)

In considering the district court's denial of a motion to suppress, the factual determinations are reviewed for clear error and the application of law to the facts are reviewed *de novo*, construing all facts in the light most favorable to the government. *United States v. Boyce*, 351 F.3d 1102, 1105 (11th Cir. 2003).

### ARGUMENT-2
### (Denial of Rule 29 Motion as to Count-3)

This Court must review *de novo* a District Court's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the government's favor. *United States v. Friske*, 640 F.3d 1288, 1290–91(11th Cir.2011). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Herrera*, 931 F.2d 761, 762 (11th Cir.1991). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir.1989). But "[w]hen the government relies on circumstantial evidence, reasonable inferences, not mere

3

speculation, must support the conviction." *United States v. Capers*, 708 F.3d 1286

(11th Cir. 2013), *United States v. Mendez,* 528 F.3d 811, 814 (11th Cir. 2008).

## ARGUMENT-3
### (Prosecutorial Misconduct During Closing Argument)

In reviewing the claim of prosecutorial misconduct, the Court must determine

(1) whether the challenged comments were improper, and (2) if so, whether they

prejudicially affected the substantial rights of the defendant. *United States v.*

*Obregon*, 893 F.2d 1307, 1310 (11th Cir.), cert. denied, 494 U.S. 1090, 110 S.Ct.

1833, 108 L.Ed.2d 961 (1990).

## ARGUMENT-4
### (Denial of Objection to the Base Offense Level of PSR)

With respect to sentencing guideline issues, this court reviews purely legal

questions *de novo*, a district court's factual findings for clear error, and, in most

cases, a district court's application of the guidelines to the facts with "due

deference." *United States v. White*, 335 F.3d 1314, 1317 (11th Cir.2003). For a

factual finding to be "clearly erroneous," this court, "after reviewing all of the

evidence, must be left with a definite and firm conviction that a mistake has been

committed." *United States v. Foster*, 155 F.3d 1329, 1331 (11th Cir.1998).

## ARGUMENT-5
### (Granting in Part of Government's Omnibus Motion *In Limine*)

On appeal the courts must review the district court's evidentiary rulings for

abuse of discretion. *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006), cert. denied, 127 S.Ct. 1305 (2007). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

## ARGUMENT-6

## (Cumulative Error)

The cumulative error doctrine provides that an aggregation of non-reversible errors ( i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189,1223 (11th Cir. 2005) (quotation marks omitted). "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error—courts look to see whether the defendant's substantial rights were affected." Id.(quotation marks omitted).

# SUMMARY OF THE ARGUMENTS

## ARGUMENT-1

The District Court erred in denying Appellant's motion to suppress. The relevant facts on this issue are not controverted. Soon after Mr. Estadella was stopped while driving the work van on November 30, 2020, he was detained and taken to the Hialeah Police Station. At the station, Mr. Estadella refused to consent to the search his house. The police asked Mr. Estadella who owned the house and he told police that his stepfather, Lazaro Soriano owned the house. It should be noted that soon after the police discovered the "contractor number" in the fender of the van, they learned that the van and the company were registered to the house located at 318 West 17 Street, in Hialeah, Florida. The police then performed a records check to see who resided in said address. According to Sergeant De Lima, they discovered that the people that occupied the house were "Mr. Quevedo and Mr. Estadella." Thus, the police records search did not indicate that Lazaro Soriano was a resident at the house. After Mr. Estadella refused to consent to the search, the police conducted a second records search and they discovered that the owner of the house was Lazaro Soriano. The police then went to the house to seek consent to search from Mr. Soriano but he was not at the house. The police eventually located Mr. Soriano at his stepdaughters house, Dianellys Estadella at 2030 East 7th Avenue, in Hialeah, Florida. While at his stepdaughters house Mr. Soriano gave consent to search the house in question. In reality, at the time that Soriano

consented to the search of the house, he no longer lived in the house in question and was not the legal owner of the house in that he had already quitclaimed all his interest to that house to his stepdaughter Dianellys Estadella and her daughter Selma Pardo. Thus, because Mr. Estadella refused to consent to the search prior to the police obtaining Mr. Soriano's consent, and because Mr. Soriano was no longer living in the house in question, and because he was not the legal owner of the house he did not have authority to consent to the search. In addition the police could not have infer or conclude that Mr. Soriano had authority to consent because they located Mr. Soriano at his daughter's house and because their initial records search indicated that the people that occupied the house were Mr. Quevedo and Mr. Estadella. Thus, the police cannot rely on the good faith exception in this case.

## ARGUMENT-2

The District Court erred in denying Appellant's Rule 29 Motion as to Count-3 because there was no evidence presented during trial to establish that Appellant was any where near the house during the dates charged in Count-3 (from November 30, 2020 to December 1, 2020). Also there was no evidence presented during trial that established beyond a reasonable doubt the elements required as to Count-3.

## ARGUMENT-3

The District Court erred by denying Appellant's objection to a comment made by the prosecutor during closing argument that defense counsel in his closing

arguments was trying to defend the indefensible. The prosecutor's exact words were "it's impossible to defend the indefensible." This statement was very prejudicial and impacted Appellant's Constitutional Rights to an attorney, to a fair trial, and to make the Government proof each element of each offense beyond a reasonable doubt.

## ARGUMENT-4

The District Court erred by overruling Appellant's Objection to Paragraph 23 of the Presentence Investigation Report (PSR) and sentenced Appellant at a Base Offense Level of 26 pursuant to U.S.S.G. § 2D1.1(c)(7) instead of sentencing the Appellant at a Base Offense Level of 18 pursuant to U.S.S.G. § 2D1.1(c)(11).

## ARGUMENT-5

The Court erred by granting in part the Government's Omnibus Motion *In Limine* to Admit Intrinsic and Extrinsic Evidence and Related Notices Under Rule 404(b).

## ARGUMENT-6

The cumulative effect of the of errors denied Appellant his due process right to a trial that was fair.

## COURSE OF PROCEEDINGS AND DISPOSITION IN COURT BELOW

On July 9, 2021, the Grand Jury returned an indictment against the Appellant, Joan Manuel Estadella, charging him in **Count-1**, with Possession of a Firearm and Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1), and 924(a)(2); in **Count-2,** charging him with Possession of a Firearm and Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1), and 924(a)(2); in **Count-3,** with Possession of a Controlled Substance with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1); and, **Count-4,** charging him with Possession of a Firearm in Furtherance of a Drug-Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). [DE:3]

On December 14, 2021 the Court entered an order allowing the Federal Public Defenders Office to withdraw as counsel of record for Mr. Estadella and appointed the undersigned attorney as a CJA panel attorney to represent the Appellant. [DE:41, 42, & 43]

The Appellant filed his Motion to Suppress Evidence on August 30, 2022. [DE:70] The Government filed its Notice of Intent to Introduce Expert Testimony and Omnibus Motions *in Limine* to Admit Intrinsic and Extrinsic Evidence and Related Notice Under Rule 404(b) on August 30, 2022. [DE:71 & 72] The Government filed its Response to Appellant's Motion to Suppress on September 13, 2022. [DE:83] The Appellant filed his reply to the Government's Response to Defendant's Motion to Suppress on October 4, 2022. [DE:91] On October 7, 2022

the Appellant filed his response to the Government's Omnibus Motion *in Limine*. [DE:93] The Government filed its reply to Appellant's response to the Government's Omnibus Motion *in Limine* on October 21, 2022. [DE:99]

On November 1, 2022, a hearing was held as to the Government's Omnibus Motion *In Limine*. [DE:105] [DE:192]

The hearing regarding Appellant's Motion to Suppress [DE:70] began on November 7, 2022, with the testimony of Lazaro Soriano. [DE:111][DE:127] The Motion to Suppress hearing was then continued to and concluded on November 14, 2022. [DE:118] [DE:128] Appellant's Motion to Suppress was denied. [DE:128:205 to 221:1-2]

The Appellant filed a motion to preclude the expert witness testimony of DEA S.A. Shaun Perry. [DE:113] The Government filed its response to said motion on November 14, 2022. [DE:114] On November 14, 2022 the Court entered an order granting in part and denying in part the Appellant's motion to preclude expert testimony [DE:113]. [DE:120]

On December 30, 2022 the Appellant filed his Motion to Dismiss the Indictment. [DE:1330] On January 4, 2023 the Court entered an order denying Appellant's Motion to Dismiss the Indictment for reason stated on the record. [DE:132 and 133]

The jury trial began on January 10, 2023. [DE:136] [TT:DE:180] The trial continued on January 11, 2023. [DE:138] [TT:DE:181] The third day of trial was

on January 12, 2023. [DE:139] [TT:DE:182] The trial concluded on January 13, 2023. [DE:140] [TT:DE:183] The jury found the Appellant guilty as to Counts 1, 2, and 3 of the Indictment, and acquitted Mr. Estadella of Count-4. [DE:143] [TT:DE:183:986]

On February 13, 2023, the Appellant filed his Motion to Dismiss Counts 1 or 2 of the Indicment or in the Alternative to Merge Counts 1 and 2 and Authority in Support Thereof. [DE:153] On March 30, 2023 the Court entered an order dismissing Count-2 of the Indictment. [DE:155]

On March 10, 2023, the United States Probation Office filed the Presentence Investigation Report (PSR) under seal. [DE:157-SEALED] The Appellant filed his objections to the PSR on March 24, 2023. [DE:162] Appellant also filed his Motion for Downward Variance [DE:164] on March 27, 2023. On March 28, 2023, the Government filed its response to Appellant's objection to the PSR and response to motion for downward variance. [DE:165]

Appellant's sentencing hearing was held on March 29, 2023. The Appellant was sentenced to 96 months in prison, followed by a term of supervised release of four (4) years, and a criminal assessment of two-hundred ($200.00) dollars. [DE:168] [ST:DE:184:52:1-6]

Mr. Estadella timely filed his Notice of Appeal on March 31, 2023. [DE:170]

The Appellant is currently incarcerated at Petersburg Medium, serving his 96 months prison term.

**STATEMENT OF THE FACTS**

1. **Star Motel**

On November 28, 2020 the Hialeah Police Department was notified of a shooting and a possible kidnaping that had occurred in room 13 of the Star Motel, located at West 16th Avenue and Okeechobee Road in Hialeah, Florida. [TT-2:297:11-14] [TT-2:506:1-25]

On November 28, 2020 there were four individuals inside room 13 of the Star Motel. [TT-2:400:10-12] There was a lady named Herbella, a man named Anthony Sanabria or Garcia, another man named Shaeaun Childs and the lady that left the motel with the two suspects. [TT-2:400:13-25][TT-2:401:1-23] The two suspects that went to room 13 on November 28, 2020 were covering their faces with masks. [TT-2:401:24-25] [TT-2:402:1] It should be noted that the three individuals that remained in room 13 after the incident did not identified the Appellant as being one of the two suspects. [TT-2:402:2-4] In fact, the BOLO that was put out described the shorter individual as being 18 years of age. [TT-2:402:5-13]

Detective Mui testified that Mr. Sanabria, one of the individuals in room 13, gave a tape recorded statement to the detectives from the Special Victims Unit on November, 28, 2020 where he named a man known as "Pistolita" [1]as one of the

---

[1] Detective Mui detained Pistolita on a later date but released him because the State of Florida had dropped all charges. [TT-2:409:13-17] [TT-2:410:1-5] Pistolita's real name is Mauricio Maldonado. According to Mui, Pistolita was the person that fired the bullet into room 13. [TT-2:410:6-8] He also talked to the girl that ran out of the room 13 of the Star Motel with the two suspects. She informed Detective Mui that nothing happened that day. That she was not kidnaped. [TT-2:410:9-14]

12

two suspects. [TT-2:395:5-9] In his recorded statement, Mr. Sanabria also provided to the detective the telephone number of "Pistolita." [TT-2:237:2-23] [TT-2:316:17-24][TT-2:397:12-20] [TT-2:397:21-23]

2. **Second Crime Scene, Palm Avenue and 17th Street**

After the incident on November 28, 2020 Mr. Childs left the Star Motel and followed a vehicle that he believed was the suspects' get away car. [TT-2:402:14-16] While Mr. Childs was following the vehicle he called 911. [TT-2:402:19-21] While Childs was talking to the 911 operator, he told the operator that the girl that was abducted from room 13 was 17 years of age. [TT-2:402:22-25] [TT-2:403:1-18] The vehicle that Childs was following was stopped by the police. [TT-2:402:14-16]

According to Detective Mui, the male occupant that exited the room and went after the subjects that fled, mistakenly followed another vehicle that left the scene to Miami International Airport. During the Course of the investigation it was determine that the man in the vehicle was not involved in the case. [TT-2:317:14-24]

**3. Surveillance Videos**

On November 30, 2020 after Detective Mui was assigned to the case, he collected the CCTV videos from the Star Motel and surrounding businesses, Whatever It Takes Transmission (WIT), and Rush Enterprise. [TT-2:299:7-15] Detective Mui then reviewed the surveillance videos and he was able to

13

determined how the two suspects arrived at the Star Motel. [TT-2:299:19-22] According to Mui, the suspects arrived in a white economy lines van, with no windows on the side. The van had two ladders on the roof and the two suspects were wearing masks. [TT-2:299:22-25] [TT-2:300:1-2] After they arrived, they pulled into the parking lot. [TT-2:300:7-10] The taller subject was wearing a bright neon green mask, and the shorter subject had something covering his face. [TT-2:300:14-17]

   After the two suspects parked the van, they exited the van and walked in an east to west direction.[TT-2:301:12-14] From the video, Detective Mui determined that both suspects were armed with firearms. [TT-2:303:1-3] Both of the suspects went to room 13 of the motel.The taller subject knocked on the door and when the door opened there was a confrontation and both subjects produced a firearm. The occupants then tried to close the door, however the taller subject reached in and both suspects tried to push the door open. At this point the taller subject's hand goes inside the room and a shooting took place. A female then exited the room and ran with both suspects towards the van and  left the scene. [TT-2:303:6-23] According to Detective Mui, the shot fired was not captured on the video. [TT-2:304:1-5] After watching the videos, Detective Mui concluded that the shorter subject was wearing an olive green long sleeve shirt, a dark color face mask and a blue distinctive hat that had the word "Miami" on the front written in cursives. On the back of the hat, it had a unique emblem. He also concluded that the taller

subject was wearing a red and blue striped shirt with a green ski mask.
[TT-2:304:6-13] Mui later testified that he was able to determine from another
video that the shoes that the shorter subject was wearing were gray with black
Jordan sneakers. [TT-2:316:5-9] The videos also showed when the two suspects
and the female entered the van and left the scene. [TT-2:316:12-16]
[TT-2:318:18-25] [TT-2:319:1-2] According to Mui, the video obtained from Rush
Transmission shows that the taller subject and the female enter the rear sliding door
of the van. The van then moves in a south to north direction. [TT-2:322:21-25]
From another video, Mui was then able to obtain an EC (contractor number) from
the fender of the van. He then queried the number on-line and he was able to come
up with the name of the business. [TT-2:324:24-25] [TT-2:325:1-2]  The
Government then introduced Exhibit 20b, which was a still photo of the video that
showed the contractor number. [TT-2:325:15-20] Based on the contractor numbers
on the van, Mui was able to find that the number belonged to a company named J
and M Electric, LLC. [TT-2:325:23-25] Also, Mui was able to determine  that the
company belonged to the Appellant, Joan Estadella, and that the white van was
purchased and it was registered to the Appellant as well. [TT-2:326:1-5] Most
importantly, the address associated with the business and the registration of the van
was 318 West 17 Street. Hialeah, Florida. According to Sergeant De Lima, after
they discovered the occupational business number on the van in one of the
surveillance videos, they performed a computerized search in order to determine

who was actually residing at 318 West 17th Avenue in Hialeah, Florida. The police search revealed that the people who were residing at the address in question were Mr. Quevedo and Mr. Estadella. [TT2:456:2-12]

## 4. Third Crime Scene, the Traffic Stop of White Work Van

After they established the identity of the subject, they established a team to respond to Appellant's residence. However, once they arrived the Appellant was not home. A short time later, Sergeant De Lima locate the van not far from the house. [TT-2:328:3-12] The van was stopped at East 6th Avenue and 23rd Street in Hialeah, Florida. The van had the two orange ladders on top and the same "contractor number" on the front fender.[TT-2:328:13-19] The van was stopped on November 30, 2020.[TT-2:337:15-25] When Mui arrived he saw the same work van depicted in the surveillance videos with the orange ladders, the same "contractor number" on the fender. He also saw the Appellant and his girlfriend. [TT-2:329:1-6] Appellant was driving the van and his girlfriend, Yoana Quevedo was the passenger. [MST:42:9-14] Ms. Quevedo disclosed to Detective Mui that her firearm was inside her purse in the van. Her purse was located between the driver and passenger seat on the floorboard. [MST:42:9-22]

The van was towed and they just took down biological information from the Appellant such as his name, date of birth and who he lived with. The Appellant remained at the scene for about 30 minutes. Thereafter, the Appellant was transported to the station where he was presented with a Miranda rights form.

[TT-2:330:3-17]

After the van was impounded, they detained the Appellant and his girlfriend pending further investigation. [TT-2:340:8-15] They then obtained consent to search the Appellant's house from the Appellant's father, who owned the house[2]. [TT-2:340:16-25] [TT-2:341:1] Mui also testified that it was his understanding that the Appellant's father[3] was living at the house in question. [TT-2:DE:181:341:2-3] However, Mui also testified that the Appellant's father was actually staying somewhere else. [TT-2:DE:181:341:4-5]

5. **Interview of Joan Estadella**

At the station, Detective Pelaez took a post-Miranda statement from Mr. Estadella. [MST:16:17-19] Detective Pelaez also provided to Mr. Estadella a basic consent form to search the house and he refused to sign the consent to search form. [MST:16:20-25] [MST:17:1-4] Because Mr. Estadella did not want to sign the consent form, Detective Mui asked him who owned the house and Estadella replied that his father did. [MST:17:5-6] [DE:128]

**6. Consent to Search the House from Lazaro Soriano**

---

[2] It should be noted that Lazaro Soriano was not the actual owner of the house on November 30, 2020. Mr. Soriano had in fact quitclaimed all his interest to the house to Dianellys Estadella prior to November 30, 2020, however the quitclaim deed had not yet been recorded.

[3] Lazaro Soriano was married to Appellant's deceased mother and was not Appellant's father and he was not living at the house in question on November 30, 2020.

The police then searched the Miami-Dade County property appraisal records and Appellant's step-father, Lazaro Soriano appeared as the owner of the house in question. [MST:64:13-21] Detective Elosegui and Detective Pelaez went to Appellant's house and made contact with Appellant's son[4], and the son let the detectives to his aunt's house. On November 30, 2020 Mr. Soriano signed a consent to search the house without limitations as to where to search. [MST:18:12-17] On the date that Mr. Soriano signed the consent, he was living with his stepdaughter, Dianellys Estadella, at 2030 East 7th Avenue, in Hialeah, Florida. [TT-3:665:1-4] Mr. Soriano had moved out of the house located at 318 West 17th Avenue in Hialeah around Thanksgiving of 2020.[TT-3:665:12-24] Caesar, the boyfriend of one of Dianellys Estadella's daughter, moved Mr. Soriano's bed and nightstand to Dianellys house.[MST:143:15-25] [MST:144:1-18] The police located Mr. Soriano at Dianellys Estadella's house on November 30, 2020. Mr. Soriano executed the consent to search form while at Dianellys Estadella's house. [MST:160:9-19] After Mr. Soriano signed the consent to search form, he travelled to the house in in question and open the door with a key to let the police in the house. [MST:168:9-11] [MST:169:9-10]

---

[4] This information was not contained in any police report. However, Appellant's minor son did live in the house in question.

**7. The Consensual Search of the House**

On November 30, 2020 Detective Mui conducted the consensual, preliminary search of the house with Detective Pelaez.  [TT-2:341:6-11] According to Mui, after entering the house they located the Jordan shoes that were depicted in the video surveillance as well as the "Miami" hat that Appellant was wearing. Mui testified that the Appellant was the individual wearing those items in the surveillance video. [TT-2:342:8-15] After they saw the items, they withdrew from the residence and place an officer outside the house to preserve the scene while they applied for a search warrant. Mui then drafted a search warrant that was signed by a Miami-Dade Circuit Court judge of December 1, 2020 and they went back to the house to execute the search warrant. [TT-2:343:2-6] They also applied for a warrant to search the van and to obtain a DNA sample from the Appellant. [TT-2:343:12-18]

**8. Fourth Crime Scene, the Search of the House pursuant to Search Warrant**

On December 1, 2020, after they obtain the warrant to search the house, detectives Mui, Pelaez, Elosegui, as well as other detectives went to search the house.  [TT-2:343:19-25] [TT-2:344:1-2] They went inside the house and began conducting a search of the bedroom where they located the items of evidentiary value pursuant to the consensual search the night before. They also found in a nightstand in the bathroom a holstered and a black firearm. [TT-2:346:17-25

[TT-2:347:1-2] The model of this gun was a Springfield Armory. [TT-2:355:5-8] The gun had 5 rounds of ammunition in the magazine [TT-2:355:12-18] Mui also testified that the gun was black, and that it was manufactured in SI Geneseo, Illinois and the serial number was CC121963. [TT-2:356:1-18]

Inside the dryer, they located one glove that matched the gloves that the shorter suspect was wearing on the surveillance videos, which was a pair of white garden gloves with the blue rubberized palm side. Another glove was found on the sofa that was located as you walk into the house, just before Appellant's bedroom. [TT-2:352:4-313] [TT-2:356:23-25] [TT-2:357:1-9]

In the living room they located the olive green shirt that resembled the shirt that the shorter suspect was wearing on the surveillance video. [TT-2:469:1-25] [TT-2:470:1-4]

## 9. Amended Search Warrant, for the Office Inside the House

They then searched a room towards the end of the hallway that was locked with a key pad. They attempted to get the combination of the key pad from Appellant's stepfather but he did not know the combination. The police then kick down the door and entered the room. It was an office room with a desk. Inside one of the desk drawers, the police located a large quantity of crystal methamphetamine, baggies and a money counter. [TT-2:470:5-23] They then ceased the search because the search warrant that they had did not authorized narcotics or anything of that nature on it. So the police stopped their search of the house and sought an

amended warrant. They once again secured the house and waited for the amended search warrant. [TT-2:470:23-25][TT-2:471:1-5] [TT-2:471:11-14]

After they obtained the amended search warrant, the Narcotics Unit conducted the search of the office room in the house. The narcotics were discovered inside a small nylon case along with paraphernalia. The paraphernalia consisted of measuring spoons, digital scales and several clear plastic baggies containing crystal meth. The small nylon bag was found inside a large black bag. [TT-3:693:18-25 [TT-3:694:1] [TT-3:694:16-20] They also found inside the office, a money counting machine and several dozen unused baggies. [TT-3:697:7-11] [TT-3:697:12-14] [TT-3:701:16-20] They also found a poster of the movie Scarface with the face of someone else superimposed on the poster. [TT-3:731:21-22] [TT-3:731:23-25][TT-3:732:12-17][TT-3:733:3-5] According to Detective Mui, the Appellant's face was superimposed on the poster[5]. [TT-2:364:25] Sgt. De Lima also testified that Appellant's face was superimposed on the Scarface poster. [TT-2:473:2-19]

## 10. Secondary Search of the Bedroom by the Major Crimes Unit

As the Narcotics Unit searched the office, the Major Crimes team performed a secondary search of the house. [TT-2:471:18-25] [TT-2:472:6-9] During the secondary search of the house, they recovered a purple 9-millimeter Taurus firearm

---

[5] However, Detective Gato was unable to testified that the face that was superimposed on the poster was that of Mr. Estadella.[TT3:732:12-17][TT3:733:3-5]

inside a nightstand drawer, in Mr. Estadella's bedroom. [TT-2:472:10-14] They

found it during the secondary search, because the nightstand drawer was hidden on

top of a lot of clothing. [TT-2:472:15-22] During trial, the Government presented

testimony from Criminalist II, Tyler Brown, who is an expert in firearms and tool

mark identification. [TT-3:592:1-25] [TT-3:593:1] Mr. Brown testified that the 9-

millimeter casing that was found inside room 13 of the Star Motel on November

28, 2020 was created by the 9-millimeter Taurus firearm that was found in the

bedroom in Mr. Estadella's house. [TT-3:597:22-25] [TT-3:598:1-25]

[TT-3:599:1-25] [TT-3:600:1-25] [TT-3:601:1-25] [TT-3:602:1-14]

## 11. Search of the Van Pursuant to Search Warrant

On December 1, 2020, Detective Mui obtained a warrant to search the van.

[TT-2:375:1-5] Inside the van they found a black bag in the center console that

contained a medium size black firearm. This was a medium size gun compared to

the smaller gun that the jury saw earlier. [TT-2:375:6-10] This gun was a Smith &

Wesson, with an extended magazine, which caused it to have a longer grip.

[TT-2:377:19-21] [TT-2:378:1-16] Also inside the van they found several pairs of

the blue and white gloves. They also found a box containing gloves

[TT-2:376:21-25]

## 12. Search Warrant for Appellant's DNA

The police also obtained a search warrant for Appellant's DNA.

[TT-2:387:10-20] The police met with Appellant and they took a DNA swab of

Appellant's mouth and submitted it to the lab for comparison. [TT-2:387:21-24] [TT-2:387:25] [TT-2:388:1-3] The police also submitted DNA swabs from the three firearms and the article of clothing that were impounded for comparison. [TT-2:388:4-7] [TT-2:389:4-16] The only item seized that matched Mr. Estadella's DNA was the hat with "Miami" written in cursives that was found in the bathroom. [TT-3:638:3-25]

**ARGUMENT-1**

**THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE**

The relevant facts to this issue in chronological order are as follows:

On November 30, 2020, after the work van that Appellant was driving was stopped, the Appellant and his girlfriend, Yoana Quevedo were transported to the police station for further interviews. [MST2:16:3-7] At the station, Detective Pelaez took a post-Miranda statement from Mr. Estadella[6]. [MST2:16:17-19] Detective Pelaez also provided to Mr. Estadella a consent to search form. Mr. Estadella refused to sign the consent form. [MST2:16:20-25] [MST2:17:1-9] Detective Mui then asked him who owned the house and Mr. Estadella replied that

---

[6] The post arrest statement taken from Mr. Estadella was not introduced by the Government during trial.

his father did. [MST2:17:5-6][MST2:46:21-23] Thereafter, Detective Mui searched the Miami-Dade County property appraisal's records and and he learned that Lazaro Soriano was the owner of the house[7]. [MST2:64:13-21] However, it should be noted that according to Sergeant De Lima, after they discovered the "contractor number" in the fender of the van, they performed a computerized search in order to determine who was actually residing at 318 West 17th Avenue in Hialeah, Florida. This search revealed that the people that resided at the house were "Mr. Quevedo and Mr. Estadella." [TT2:456:2-12] The search did not show that Lazaro Soriano was residing the house. Thereafter, Detectives Elosegui and Pelaez went to Appellant's house and made contact with Appellant's minor son. According to Detective Mui, Appellant's minor son told Olesegui and Pelaez that his grandfather was at his aunt's house and apparently gave the detectives directions how to go to his aunt's house. [MST:18:1-20] Elosegui and Pelaez then located Mr. Soriano at Dianellys Estadella's house. The consent to search was executed by Soriano on November 30, 2020 at Dianellys Estadella's house, located at 2030 East 4th Avenue in Hialeah. [MST2:44:1-25] According to Detective Pelaez, after Mr. Soriano signed the consent form at Dianellys Estadella's house, they went to the

---

[7] However, Lazaro Soriano was not the actual owner of the house on November 30, 2020 because he had Quitclaim all his interest in the house to Dianellys Estadella and her daughter Selma Pardo on November 23, 2020. [MST2:82:12-25]

house in question. When they arrived at the 318 address, Mr. Soriano opened the door of the house with a key. [MST2:190:1-4] Detective Pelaez did not recalled if the door also had a secondary lock. [MST2:190:5-6] Thereafter, Detective Mui conducted the consensual search of the house with Detective Pelaez. [TT-2:341:6-11] Detective Mui looked through the gap of a curtain that was covering the bedroom door, and saw a shoes on the floor and articles of clothing. [MST2:22:11-14] Before Detective Mui entered the bedroom, he noticed one Jordan shoe.[MST2:23:11-15] According to Detective Mui, the color and the pattern of the shoe matched the one depicted in the video surveillance. [MST2:24:1-5] After observing the shoe, Detective Mui looked to the left of the entranceway and he noticed the other matching shoe. [MST2:24:9-11] Detective Mui then went into the bathroom that was inside the bedroom and he saw the particular hat depicted in the video surveillance, the blue hat with "Miami" written in cursive. [MST2:24:12-16]

After they saw these items, they withdrew from the residence and place an officer outside the house to preserve the scene while Detective Mui drafted the affidavit in support of the search warrant. The search warrant was signed on December 1, 2020 by a Miami-Dade Circuit Court Judge, Nushin Sayfie and the

police returned to the house to execute the search warrant on the same date.

[TT-2:343:2-6]

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. Generally, a search of a person's house conducted without a warrant is *per se* unreasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967). There are, however, some specific exceptions to the warrant requirement. One of these exceptions accepts the validity of warrantless searches when an individual possessing authority gives law enforcement consent. *Georgia v. Randolph*, 126 S. Ct. 1515, 1520 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). The doctrine of third party consent recognizes that, under certain circumstances, individuals other than the householder against whom evidence is sought may validly consent to a search of shared premises.

Recent developments in this area of law have established an additional exception. A third party with common authority over a residence may consent to a police search that affects an absent co-occupant. *United States v. Matlock*, 415 U.S. 164 (1974). The exception for third party consent to a warrantless search extends to searches that are based on the consent of a co-occupant whom the police reasonably believe to have common authority over the

premises, even if the co-occupant in fact has no such authority. *Illinois v. Rodriguez*, 497 U.S. 177 (1990) An interesting variation on the typical third party consent scenario involves the case of "dueling roommates," in which a resident of a shared premises (the "third party") consents to a search, while another resident (the "primary party" at whom the search is directed) is present, and objects. This presents the question: Does the constitution permit one co-occupant to consent to the warrantless search of a shared residence over the express refusal of another co-occupant?

Until recently, Supreme Court jurisprudence in the area of third party consent searches followed a consistent path of restricting individual privacy rights while broadening the scope of lawful police searches. The seminal cases in this area of the law, *United States v. Matlock* and *Illinois v. Rodriguez*, both upheld the validity of searches based on third party consent, relying on the rationales of common authority and assumption of risk. As cases involving dueling roommates began to arise, however, the lower courts are split in determining whether the third party's consent or the primary party's refusal prevails. When the Supreme Court granted certiorari to *Georgia v. Randolph*, 544 U.S. 973 (2005) (granting certiorari), a case in which a wife gave police consent to search the marital home over her husband's express and contemporaneous refusal to give such consent, the weight of authority suggested

that the co-occupant's consent would render the search reasonable as to the objecting co-occupant. However, the Court did not uphold the validity of the co-occupant's consent, but rather held that if a warrantless search is conducted on the basis of consent given by one occupant over the express refusal of consent by a physically present co-occupant, then the search is unreasonable as to the objecting occupant. *Georgia v. Randolph*, 126 S. Ct. 1515, 1526 (2006).

In the case at bar, the relevant facts are very unique. It is undisputed that after the police obtained from surveillance videos the "contractor number" on the van, the police checked the records to see who resided at 318 West 17th Street, in Hialeah, Florida. The police searched determined that the only people living in the house were Mr. Quevedo and Mr. Estadella. [TT2:456:2-12] This records search did not indicate that Lazaro Soriano was leaving at the house. Thus, the police was put on noticed that the people that were occupying the house in question were Mr. Quevedo and Mr. Estadella and not Lazaro Soriano.

The next significant thing that took place related to the consent was that Mr. Estadella at the police station refused to give consent to the search of the house. [MST:16:20-25] [MST:17:1-4]

The police then searched the Miami-Dade County property appraisal records and Appellant's step-father, Lazaro Soriano appeared as the owner of the house. [MST:64:13-21] Detective Elosegui and Detective Pelaez then went to Appellant's house and made contact with Appellant's son, and the son informed the detectives

that his grandfather was at his aunt's house. On November 30, 2020 the police found Mr. Soriano at Dianellys Estadella's house. There he signed the consent form. [MST:18:12-17] [MST:160:9-19] Most importantly, on the date that Mr. Soriano signed the consent, he was living with his stepdaughter, Dianellys Estadella, at 2030 East 7th Avenue, in Hialeah, Florida. [TT-3:665:1-4] Mr. Soriano had moved out of the house located at 318 West 17th Avenue in Hialeah around Thanksgiving of 2020[8].[TT-3:665:12-24] Caesar, the boyfriend of one of Dianellys Estadella's daughter, moved Mr. Soriano's bed and nightstand to Dianellys house.[MST:143:15-25] [MST:144:1-18] After Mr. Soriano signed the consent to search form, he travelled to the house in in question and open the door with a key to let the police in the house. [MST:168:9-11] [MST:169:9-10]

In the case at bar, we have a situation where neither the Appellant nor the Lazaro Soriano were present at the property to be searched. However, it is undisputed that Mr. Estadella refusal to give consent took place before Soriano gave his consent.Regardless, it is very clear that Mr. Soriano did not have "common authority" over the house in question to consent to a police search. U*nited States v. Matlock*, 415 U.S. 164 (1974). Furthermore, from the undisputed relevant facts in this case, the police was on notice that the Mr. Soriano was not one of the people that was lawfully residing in the house and thus the police knew or should have known that Mr. Soriano did not have "common authority" over the

---

[8] Thanksgiving of 2020 was on November 26, 2020.

house in question. Accordingly, the police cannot rely on the "good faith exception" because in applying the objective standard the police did not have a reasonable believe that Lazaro Soriano had authority to consent to the entry into Mr. Estadella's house.

As stated by the Supreme Court in *Illinois v. Rodriguez:*

> As *Stoner*[9] demonstrates, what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. **Even when the invitation is accompanied by an explicit assertion that the person lives there**, **the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry**. As with other factual determinations bearing upon search and seizure, **determination of consent to enter must** "**be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' " that the consenting party had authority over the premises**? *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then-warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

In the case at bar, the uncontroverted facts warrant a man of reasonable caution and belief to find that the Lazaro Soriano had no authority over the house in question to allow the police to search. Accordingly, the District Court's denial of Mr. Estadella's motion to suppress should be reversed and remanded to the District Court with instructions to grant Appellant's motion to suppress.

---

[9] *Stoner v. California*, 376 U.S. 483 (1964)

**ARGUMENT-2**

**THE DISTRICT COURT ERRED WHEN IT DENIED**

**APPELLANT'S RULE 29 MOTION AS TO COUNT-3 OF**

**THE INDICTMENT**

The Appellant was charged in Count-3 of the Indictment with Possession of a Controlled Substance with the Intent to Distribute. [DE:3:2] The Indictment also alleges that this crime occurred "From on or about November 30, 2020 to December 1, 2020…" [DE:3:2] The Appellant set forth two reasons in support of his Rule 29 Motion as to Count-3. First, that no evidence was presented to establish that Appellant was any where near the house in questions from November 30, 2020 to December 1, 2020. Thus, the Government was not able to establish that Appellant was in control, possession, or dominion of the house during those dates. Secondly, Appellant argued that based on the evidence presented during trial the Government was not able to establish beyond a reasonable doubt the elements required as to Count-3. [TT3:819:5-18]

According to the Court's jury instructions, the elements of the crime of Possession with the Intent to Distribute a Controlled Substance (Methamphetamine) are as follows:

> The Defendant can be found guilty of this crime only if all
>
> the following facts are proved beyond a reasonable doubt:
>
> (1) the Defendant had <u>knowledge of the methamphetamine;</u>

(2)  The defendant possessed the methamphetamine; and

(3) the Defendant intended to distribute the methamphetmine.

*United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014)

The Defendant "knowingly" possessed the controlled substance if (1) **the Defendant knew he possessed a substance listed on the federal schedules of controlled substances**, even if the Defendant did not know the identity of the substance, or (2) the Defendant knew the identity of the substance he possessed, even if the Defendant did not know the substance was listed on the federal schedules of controlled substances.

To "**intend to distribute" is to plan to deliver possession of a controlled substance to someone else**, even if nothing of value is exchanged. [emphasis added] [DE:141:16]

In the case at bar, the only evidence that the Government presented during trial about the drugs was that the methamphetamine was found inside the office room of the house. The drugs were found inside a small nylon bag that was inside a big black bag inside the office. [TT-3:693:13-17] [TT-3:693:18-25 [TT-3:694:1] No testimony was presented about how the meth got to the house or how long the drugs had been in the house. [TT-3:739:18-20] [TT-3:739:21-23] [TT-2:436:8-12] The Hialeah Police Department had never conduct any undercover narcotics operation at the house. [TT-2:436:24-25] Despite the police finding cellular phones

on the Appellant and his girlfriend, Yoana Quevedo, they never conducted any cellphone dumps. [TT-2:435:3-12] [TT-2:436:8-12] The police was aware that there was a Ring camera in the front of the house, however the police never retrieved any videos from any cellphones or Ring camera. [TT-2::436:8-12] Although the Appellant gave a statement to the police, he was never questioned about the drugs found in the office[10]. The Government presented no testimony during trial as to Appellant's knowledge about the drugs or what he intended to do with the drugs.

During trial, Agent Perry testified that the 30 grams of meth could have sold in 2020, in Hialeah at the low end for $700.00. [TT-3:789:11-22] According to Sergeant De Lima, the more addicts consume meth the more they need to consume in order to support their strong meth habits. [TT-2:481:2-4] De Lima also testified that it was possible that two addicts could consume the 30 grams of meth in two days. [TT-2:481:5-11] It should be noted that in the bedroom where the police found the Jordan Air sneakers, as well as in the bathroom where the blue hat with "Miami" written in cursive was found, there were several bongs found that could have been used for smoking meth. In these two room there were also lighters/torches that could be used by meth addicts to smoke meth, as well as a butane tank to refill the lighters. [TT-2:413:24-25] [TT-2:414:1-2] [TT-2:415:19-21] [TT-2:415:22-25] [TT-2:422:8-25] [TT-2:423:1-15] [TT-2:423:19-25]

---

[10] Appellant's statement was not introduced into evidence by the Government.

[TT-2:424:1-11] The police did not impound any of the bongs or lighters found at the house for further testing[11]. [TT-2:414:11-14] [TT-2:414:15-23] There was also a container full of water in the bathroom. [TT-2:420:3-12] [TT-2:421:4-16] In addition, an ice machine was located just outside the bedroom where the sneakers were found. [TT-3:660:15-16] [TT-3:679:13-20] Sergeant De Lima testified that people that smoke meth need to drink lots of water to keep their bodies from getting overheated. [TT-2:479:6-21] De Lima also told the jury that in the clubs that sell meth, instead of selling liquor they sell bottles of water at a very high price. [TT-2:479:22-25] [TT-2:480:1-2] De Lima also told the jury that in the meth clubs, they would put the bouncers in the bathrooms so no one could go in the bathrooms to drink water. [TT-2:480:3-5] He added that being hydrated was essential for meth addicts to keep their bodies from overheating. [TT-2:480:6-8]

During trial, the Government called Dianellys Estadella, Appellant's twin sister to testify. She told the jury that Appellant and Yoana Quevedo, his fiance lived at 318 West 17 Street, in Hialeah, Florida and that they occupied the bedroom and bathroom in question. [TT-3:674:13-25] [TT-3:675:1-5] Ms. Estadella also testified that Ms. Quevedo has a big drug problem and is a meth addict. According to Ms. Estadella, after Ms. Quevedo was evicted from the house in question she became

---

[11] The CSI tech did photographs the bongs, lighters, butane refill cans, the jar of water, the ice machine and even some hydrating pills. These photo were introduced into evidence during trial. Photos of these items were introduced as evidence during trial.

homeless. [TT-3:678:1-5] She also testified that her brother, the Appellant also has a big drug problem and he is addicted to meth and cocaine. [TT-3:675:8-25]

In the case at bar, there is no direct evidence to establish beyond a reasonable doubt all the elements of the crime of possession with the intent to distribute methamphetamine. The first element of the crime charged in Count-3 is requires proof beyond a reasonable doubt as to whether Mr. Estadella <u>knowingly possessed methamphetamine.</u> It should be noted that although Dianellys Estadella testified that the Appellant and Yoana Quevedo lived in said house and occupied the bedroom with the bathroom in question, no testimony was presented by the Government during trial that Mr. Estadella was at the house on or about November 30, 2020 to December 1, 2020. In fact, Sergeant De Lima testified that he stopped the van and detained Mr. Estadella on November 30, 2020 at around 3:00 p.m. Both Mr. Estadella and Ms Quevedo were then taken to the Hialeah Police Station. Mr. Estadella was detained from November 30, 2020 from 3:00 p.m., until he bonded out of the Miami-Dade County Jail weeks later. [TT-2:474:5-21] [TT-2:474:19-23] No one testified that Mr. Estadella was at the house at any reasonable time "on or about December 30, 2020 and December 1, 2020" as charged in the indictment.

The second element of possession with the intent to distribute methamphetamine requires proof beyond a reasonable doubt that Appellant:

**<u>Intended to distribute</u>** the 30 grams of methamphetnmine

that was found in the house. [Emphasis added]

During trial there was no direct evidence presented by the Government to support this element. Where the Government relies on circumstantial evidence, "reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir.1994). Here there are no reasonable inferences from the facts presented during trial that the jury could have concluded that Mr. Estadella intended to distribute the 30 grams of meth. Such a conclusion is just "mere speculation". See also *United States v. Klopf*, 423 F.3d 1228 (11th Cir. 2005); *United States v. Kelly*, 749 F.2d 1541 (11th Cir), cert. denied, 472 U.S. 1029. 105 S.Ct.3506. 87 L.Ed.2d 636 (1985). The courts are reluctant to disturb a jury's determination on appeal. However, that does not mean that a jury verdict of guilty must be affirmed in all circumstances. *United States v. Lange*, 528 F.2d 1280, 1287 (5th Cir. 1976). It is a cardinal principle that no person should be subjected to punishment unless the evidence shows beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged. *United States v. Jackson*, 426 F.2d 305, 309 (5th Cir. 1970). If the evidence does not meet this standard, the defendant must be acquitted. *McWhorter v. United States*, 193 F.2d 982, 985 (5th Cir. 1952). See also  *United States v. White*, 569 F.2d 263 (5th Cir. 1978) In the case at bar, there was no direct evidence presented during trial

that Mr. Estadella possessed with the <u>intended to distributed</u> methamphetamine. A relatively small amount of drugs was found inside the house. There was no direct evidence presented at trial that Mr. Estadella intended to distribute the drugs to anyone. Thus, there are no reasonable inferences that can be reach from the facts to conclude that Mr. Estadella intended to distribute the 30 grams of meth. To reach the conclusion that Mr. Estadella "intended to distrubute" the drugs in question is nothing more  than "mere speculation".

The Court should remand this case to the District Court with instruction to vacate the jury's verdict as to Count-3 of the Indicment and enter a judgment of acquittal.

**ARGUMENT-3**

**THE DISTRICT COURT ERRED BY FAILING TO SUSTAIN APPELLANT'S OBJECTION TO PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS**

**During the Government's rebuttal closing arguments, the prosecutor told the jury as follows:**

> Now, let's start with what didn't get covered a lot, **although at the end, counsel talked a little bit about the guns, and only a little I suspect** because try as he might to try to cast some doubt on what you saw with your own eyes, what was scientifically proven to you, forensically, photographically, through surveillance videos, **it's impossible to defend the**

37

**indefensible.** [Emphasis added] [DE183; TT-Day-4:967:23-25] [DE183; TT-Day-4:968:1-4]

The Appellant objected to the improper statements and the Court overruled the objection. [DE183; TT-Day-4:968:5-7] This Court should note that Appellant's closing arguments focused solely on whether or not the Government had proven each element of each offense charged beyond a reasonable doubt. [DE183; TT-Day-4:951:21-25] [DE183; TT-Day-4:952:1-2] [DE183; TT-Day-4:952:7-11] Every defendant has a right to be represented by counsel pursuant to the Sixth Amendment of the United States Constitution. Likewise, pursuant to the Due Process Clause, as well as the Compulsory Clause of the Sixth Amendment of the United States Constitution, all defendants have a right to a meaningful opportunity to present a complete defense. *Holmes v. South Carolina,* 547 U.S. 319 (2006), quoting *Krane v. Kentucky*, 476 U.S. 683, 690 (1986),

The Government's statements were clearly improper for many reasons. First, said statement was a clear attack on defense counsel. The Government's statements put in question the character of defense counsel by implying to the jury that defense counsel had misled them by purposely "defend[ing] the indefensible." Secondly, this improper argument was in direct violation of Mr. Estadella's Due Process and Sixth Amendment Rights to a meaningful opportunity to present a complete defense. *Holmes v. South Carolina,* 547 U.S. 319 (2006), quoting *Krane v. Kentucky*, 476 U.S. 683, 690 (1986).

38

The Court should note that the improper comment was made during the Government's rebuttal closing arguments. To makes matters worse, the Court overruled Appellant's objection to the Government's improper comment. As a result, there was no instruction given to the jury to disregard this improper comment. Thus, one of the last things that the jury heard from the prosecutor's mouth was this improper comment.

The next question that this Court must determine is whether the improper comment prejudicially affected the substantial rights of the Mr. Estadella. Is not the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial. A prosecutor's remarks to the jury constitutes reversible error only when they are both "inappropriate and harmful." *United States v. Chase*, 838 F.2d 743, 749 (5th Cir.), cert. denied sub nom. *Mesa v. United States*, ___ U.S. ___, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988) (quoting *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 9, 105 S.Ct. at 1043. Instead, the appellants must show that the prosecutor's statement affected their substantial rights. *United States v. Saenz*, 747 F.2d 930, 942 (5th Cir. 1984), cert. denied sub nom. *Solis v. United States*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). In determining whether improper argument affects a defendant's substantial rights, the court should consider:

(1) the magnitude of the prejudicial effect of the statements;

(2) the efficacy of any cautionary instruction; and

(3) the strength of the evidence of the defendant's guilt.

The Government's remarks were extremely prejudicial because they impacted the Appellant's Constitutional Right to counsel; to present a defense; and to require the Government to prove each element of each offense beyond a reasonable doubt. The essence of the Governments closing argument was to tell the jury how dare defense counsel "defend the indefensible". In total ignorance of all defendants right to counsel and to present a defense. Also by making such statement the Government ignores the fact that is the Government's burden to prove each element of each offense beyond a reasonable doubt. Thus, by making such inflammatory statements the Government avoided its heavy burden of prove, because "it's impossible to defendant the indefensible."

The problem was made even worse by the Court's denial of the objection, which resulted in the jury not being instructed.

As for the strength of the evidence of Appellant's guilt, the Government's case was circumstantial and full of mere speculations.

For all these reason the Court should reverse Appellant's conviction and remand this case to the District Court for a new trial.

**ARGUMENT-4**

**THE DISTRICT COURT ERRED BY OVERRULING APPELLANT'S OBJECTION TO PARAGRAPH 23 OF THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING APPELLANT AT A BASE OFFENSE LEVEL OF 26 PURSUANT TO U.S.S.G. § 2D1.1(c)(7) INSTEAD OF A BASE OFFENSE LEVEL OF 18 PURSUANT TO U.S.S.G. § 2D1.1(c)(11)**

The Appellant filed an objection to Paragraph 23 of the PSR, which set the Base Offense Level, pursuant to U.S.S.G 2D1.1(c)(7) at level 26 for at least 20 Grams but not more than 35 grams of "actual" Methamphetamine. [DE:157:8(Sealed)] [DE:162:1] In Appellant's Objection to the PSR, as well as on his Motion for Downward Variance [DE:164], he cited a case from the Southern District of Mississippi of *United States v. Tementa Robinson*, Cause No.: 3:21-CR-14-CWR-FKB-2. In *Robinson*, the defendant was charged with possession with intent to distribute more than 50 grams of methamphetamine. Mr. Robinson pled guilty to the offense. He did not contest that he was responsible for 214.4 grams of methamphetamine, which had a purity level of 96% to 97%. At the sentencing

hearing Mr. Robinson's attorney objected to the U.S. Sentencing Guideline's provision regarding methamphetamine purity. The court paused the sentencing hearing and asked the parties to provide supplemental briefing on the issue. The Court in Robinson set out the issue as follows:

> The U.S. Sentencing Guidelines <u>use drug purity as a proxy for a defendant's culpability</u>. <u>The Guidelines say, in relevant part,</u> <u>"the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs</u>." U.S.S.G. § 2D1.1 cmt. n.27(C). **As a result, the Guidelines make a distinction** between "methamphetamine" and "actual methamphetamine." Id. § 2D1.1(c). **All else equal, defendants caught with actual methamphetamine get longer sentences than defendants caught with methamphetamine mixture**.1 Id. **"No other drug is punished more severely based on purity**." *United States v. Hayes*, 948 F. Supp. 2d 1009, 1025 (N.D. Iowa 2013) (citation omitted)…
>
> Mr. Robinson now "**respectfully requests this Court reject that purity level distinction in sentencing him because the facts of this case, and all credible data gathered since the**

42

**time the Sentencing . . . Commission promulgated these rules and related policy statements demonstrate that the purity level of methamphetamine is not indicative of Mr. Robinson's culpability.**" Docket No. 89 at 3. "**Empirical data and national trends bear out, . . . that everyone involved with methamphetamine today, whether a drug lord or an end user, has access to a substantially pure, uncut product**." Id. at 5 (quotation marks, citation, and brackets omitted)…

**In further support of his argument, Mr. Robinson's reply points to DEA data showing that "average meth purity was above 96.2% in 2014, 95.6% in 2015, 95.9% in 2016, 96.2% in 2017, 97.5% in 2018, and 97.2% in 2019." Docket No. 91 at 3-4** (citation omitted).[Emphasis added]

During trial the Government presented as a witness, Manuel Alberto Febo, who is employed as a forensic chemist with DEA. [TT3:761:24-25]  [TT3:762:1-25] Mr. Febo testified that the amount of methamphetamine hydrochloride involved in this case was 31.0 grams, with a 93% purity. [TT3:776:18-25] Mr. Febo further testified that the amount of pure drug was 28.8 grams. [TT3:778:1-11] Mr. Febo stated that statistically there was not much difference between 93% and 100% purity level. [TT3:777:1-7]

The Court in *Robinson,* then discussed several relevant cases and stated as follows:

> At the outset, the Court appreciates the parties for pointing to Judge Bennett's decision in **United States v. Nawanna, 321 F. Supp. 3d 943 (N.D. Iowa 2018)**. In that case, the United States conceded that there <u>is no empirical basis</u> for the <u>Sentencing Commission's 10-to-1 weight disparity between actual methamphetamine and methamphetamine mixture.</u> Id. at 950-51. **Other courts have found the same**. See ***United States v. Hartle*, No. 4:16-CV-233-BLW, 2017 WL 2608221, at \*2 (D. Idaho June 15, 2017) (<u>"I have tried to determine whether there is any empirical data from the Sentencing Commission or in the academic literature which would justify the ratio. I have found none.</u>"**); *United States v. Johnson*, 379 F. Supp. 3d 1213, 1223-24 (M.D. Ala. 2019) ("[J]ust as courts have criticized the link between drug quantity and the offender's role, they have also debunked the Guidelines' assumed connection between drug purity and criminal role.") (emphasis in original); id. at 1226 **("In sum, this court joins other district courts in rejecting the methamphetamine guidelines' 10-to-1 ratio because it is 'based on a flawed**

**assumption that methamphetamine purity is a proxy for role in the offense.'")** (quoting *Nawanna*, 321 F. Supp. 3d at 955); *United States v. Carrillo*, 440 F. Supp. 3d 1148, 1157 (E.D. Cal. 2020) ("For the reasons stated above, the court declares a policy disagreement with the methamphetamine Guidelines."); *Hayes*, 948 F. Supp. 2d at 1031; *United States v. Diaz*, No. 11-CR-821-2(JG), 2013 WL 322243, at *16 (E.D.N.Y. Jan. 28, 2013); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017) (**finding that the Sentencing Commission's "assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality.**"); *United States v. Cabrera*, 567 F. Supp. 2d 271, 271 (D. Mass. 2008) (explaining that this Guideline establishes a "false uniformity" by allowing quantity of drugs to mask all other factors). [Emphasis added]

The Court should also note that Appellant was charged in Count-3 of the Indictment as follows:

"Pursuant to Title 21, United States Code, Section 841(b)(1)(B)(viii),it is further alleged that this violation involved **a mixture and substance** containing 5 grams or more of methamphetamine, a Schedule II substance." [Emphasis added]

This objection should have been sustained and Appellant's Base Offense Level should have been 18 instead of 26. This matter should be remanded to the District Court with instruction to resentence the Appellant to a Base offense Level of 18.

## ARGUMENT-5

## THE DISTRICT COURT ERRED BY GRANTING IN PART THE GOVERNMENT'S OMNIBUS MOTION *IN LIMINE* TO ADMIT INTRINSIC AND EXTRINSIC EVIDENCE AND RELATED NOTICES UNDER RULE 404(b)

In its omnibus motion *in limine* the Government sought to admit during trial the following evidence:

1) Evidence of the **Star Motel** shooting that occurred on November 28, 2020;

2) Evidence of the "**Scarface**" **poster**—found in the office room where the drugs and related drug paraphernalia were found;

3) The **third (uncharged) gun**—Owned by Ms. Quevedo found in the front of the Appellant's van;

4) The **testimony by the Defendant's sister**, who observed the Defendant holding "his girlfriend's gun;"

6) The **music video uploaded to YouTube**—which was filmed in the same home where the guns and drugs charged in the Indictment were found—of the Defendant touching drug baggies and sitting next to guns and extended magazines.

A hearing was held on the Government's Omnibus Motion *In Limine* to Admit Intrinsic and Extrinsic Evidence and Related Notices Under Rule 404(b) on November 1, 2022. [DE:192] After the hearing, the Court entered a written order with regards to the Government's Omnibus Motion *In Limine* to Admit Intrinsic and Extrinsic Evidence and Related Notices Under Rule 404(b). [DE:110]

In the order, the Court ruled that the Government may introduce the following intrinsic evidence:

a. Evidence pertaining to the motel shooting that occurred on November 28, 2020, including surveillance videos and forensic evidence; and [MHT:5:16-24] [MHT:6:1-25]

b. The Scarface poster[12]. [MHT:9:9-12][MHT:24:15-]

The Court also ruled that the Government may introduce the following evidence under FED. R. EVID. 404(b):

a. Search warrant photos and testimony regarding the third

---

[12] However, the Court's stated something different on the record. On the record the court stated: I'm going to allow that in also for a couple of reasons. One, **it's neither inextricably intertwined really or 404 evidence**; it's evidence that the defendant controls that room. I mean, for a number of reasons, it wouldn't **be inextricably intertwined**, say, if in the room where the gun or drugs were found there was mail addressed to the defendant.[Emphasis added]

47

(uncharged) gun found in the Appellant's van; [MHT:17:4-7]

[MHT:18:1-25] [MHT:19:1-25] [MHT:20:1-7]

b. Testimony by Dianellys Estadella that she had previously seen the Appellant holding the gun found in the Appellant's van; [MHT:24:4-14][MHT:18:1-25]

c. DNA evidence relating to that third gun[13]; and

d. The Youtube Music Video. [MHT:20:8-25] [MHT:21:1-25]

[MHT:22:1-25] [MHT:23:1-23]

Given that the Court's order allowed the Government to present "Intrinsic and Extrinsic" evidence during trial, we must begin by examining the applicable case law.

## Intrinsic Intertwined

In determining whether to allow intrinsic evidence during trial, the district court has broad discretion to determine the admissibility of such evidence, and the appellate courts will not disturb the district court's judgment absent a clear abuse of discretion. See *United States v. Ross*, 131 F.3d 970, 987 (11th Cir.1997). Federal Rule of Evidence 404(b) provides that [e]vidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is:

(1)  an uncharged offense which arose out of the same transaction

or series of transactions as the charged offense,

_____

[13] No DNA was found in the third gun. So no DNA evidence of this gun was presented during trial.

(2) necessary to complete the story of the crime, or

(3) inextricably intertwined with the evidence regarding the

charged offense. *United States v. Ramsdale*, 61 F.3d 825, 829

(11th Cir.1995).                                    .

Evidence that is otherwise not part of the crime charged but is connected to a

chain of events that explain the context, the motive and set-up of the crime, is

properly admitted if linked in time and circumstances with the crime charged, or

forms an integral and natural part of an account of the crime, or is necessary to

complete the story of the crime for the jury. *United States v. Williford*, 764 F.2d

1493, 1499 (11th Cir. 1985), *United States v. McLean*, 138 F.3d 1398 (11th Cir.

1998)

**Star Motel Incident (November 28, 2020)**

In the case at bar the Court determining that evidence of the November 28,

2020 incident at the Star Motel was intrinsically intertwined and not 404(b).

[MHT:5:15-25] The Court then concluded that it was admissible during trial.

It should be noted that in the Government's motion *in limine,* the Government

asserted the following facts:

On November 28, 2020, Joan Manuel Estadella (the "Defendant")

**and his friend** Mauricio "Pistolita" Maldonado, **were captured on**

**surveillance footage outside a Hialeah motel**. **Estadella was**

**holding a compact black semi-automatic handgun** and **Maldonado was carrying a light purple semi-automatic handgun. During the incident, Maldonado fired a single shot from the light-purple Taurus in his hand**, after which the two men fled the scene in Estadella's van. Three days later, on December 1, 2020, the Hialeah Police Department ("HPD") executed a warrant to search Estadella's home, where they found two guns—a light-purple Taurus handgun (Count One) and a compact black Springfield handgun (Count Two) inside Estadella's bedroom bathroom. Law enforcement found a third (uncharged) gun in the Defendant's van. [Emphasis added] [DE:72:2]

It is important to note that many of the aforementioned assertions turned out to be incorrect. For example, there was no evidence presented during trial that Mr. Estadella and Mr. Maldonado (Pistolita) were "friend(s)". This is an unfounded conclusion reach by the Government. With regard to the November 28, 2020 incident at the Star Motel, the Court should note that Appellant was not charged with said incident. Neither was Mauricio Enrique Maldonado, Jr., whom Detective Mui believed to be "Pistolita". [TT-2:316:17-24] Some time after the incident, Hialeah Police Officers as well as Miami Police Officers made contact with Mauricio Enrique Maldonado, Jr. and his girlfriend and no charges were ever filed.

In fact, Maldonado was never arrested. [TT2:409:1-17] More importantly, Mr. Estadella was never identified by anyone at the scene as being at the Star Motel on November 28, 2020[14]. [TT-2:402:2-4] Thus, the Government's assertions in its motion *in limine* about Mr. Estadella's involvement on the November 28, 2020 incident are incorrect and unfounded.

From the record, it is obvious that the Court relied on the Government's incorrect statements in granting the Government's motion *in limine*. In particular the Court stated:

> Obviously the defendant is charged with possessing a firearm and ammunition as a convicted felon. **The fact that there's a video that the government says shows him and a codefendant possessing firearms, including that specific firearm**, is intrinsic to that offense. So, that's the first thing. [Emphasis added] [MHT:6:14-19]

What transpired at the Star Motel on November 28, 2020 was a very heinous act. Two individuals wearing masks, with guns arrived and tried to force their way into room 13 with guns. To make matters worse one of the two masked individual fire a shot. By allowing this type of evidence unduly prejudiced the Appellant in the eyes of the jury. Especially since the November 28, 2020 incident was commutative and

---

[14] In fact, victim Joseph Anthony Sanabria in his verbal statement to the Hialeah Police stated that 1 "Pistolita" Mauricio Enrique Maldonado, Jr. was the shorter guy and he did not know who the taller guy was.

it became the focal point of the Government's case. Surveillance videos from all angles were introduced into evidence despite the fact that no witness testified that Mr. Estadella was one of the two masked suspects in the video.

Most importantly, even if the November 28, 2020 incident was intrinsically intertwined with the two Counts of possession of the firearm by a convicted felon it certainly was not intrinsically intertwined to the count of possession of controlled substance with the intent to distribute 30 grams of methamphetamine.

**Scarface Poster**

There appears to have been confusion on the Court's part as to what type of evidence the Scarface Poster was. In its Order, the Court stated that, "[t]he Government may introduce the following **intrinsic** evidence:" Then it listed the "Scarface" poster. [Emphasis added][DE:110] However, during the Court's ruling on the record the Court stated as follows:

> The second thing is the Tony Montana poster that I guess is in the same room as where the drugs were found, alleged drugs were allegedly found. And the poster has allegedly Mr. Estadella's face superimposed onto Tony Montana. **I'm going to allow that in also for a couple of reasons**. One, <u>it's neither inextricably intertwined really or 404 evidence</u>; <u>**it's evidence that the defendant controls that room**</u>. <u>I mean, for a number of reasons, it wouldn't be inextricably intertwined, say, if in the room where the gun or drugs were found there was mail addressed to the defendant.</u>That's something the government does all the time with really no objection. And that mail is there to show what? A couple of things -- **the defendant was here, the defendant uses this room, maybe the defendant owns or controls this room**. That's true, too, with -- to a heightened degree with the photo. **<u>We've got the defendant literally looking over this room through the eyes of his picture on the wall</u>**.

The fact that the Court has categorized the "Scarface" poster on its Order as "intrinsic" evidence [DE:110] and on the records as neither " intrinsic or 404(b) evidence is very concerning. By this Court created confusion, is unclear what the Court's finding is regarding this piece of evidence but most importantly we do not know what standard the Court applied in deciding to admit the Scarface poster.

Most notably about the Scarface (Tony Montana) poster is that the Court failed to give any limiting instructions to the jury as to how to treat this poster. For example during the second day of trial Detective Mui testified about the poster and no limiting instruction followed his testimony about the poster. [TT2:364:15-21] Similarly, Sergeant De Lima also testified about the Scarface poster and no limiting instruction was given to the jury about the poster. [TT2:473:2-19] On the third day of trial Detective Gato testified about the Scarface poster. [TT3:731:20-25] [TT3:732:12-25] [TT3:733:1-10] The Court did not read to the jury any limiting instruction about the poster.

Regardless, this piece of evidence has very little probative value and is extremely prejudicial. Scarface (Tony Montana) was a remake of 1932 gangster movie. The 1983 remake tells the story of Cuban refugee Tony Montana (Pacino), who arrives penniless in Miami during the Mariel boat-lift and becomes a powerful drug lord. The movie has many gruesome scenes filled with gun violence. When it was filmed in Miami it was very controversial because it portrait the Cuban community in a very false light. As a result many of the scene were shot in

California. It should also be noted that Mr. Estadella was born in Cuba and arrived to the United States during the Mariel Boat-lift. [DE:157: Paragraphs 69-70(sealed)] Tony Montana was a ruthless drug trafficker involved in trafficking thousands and thousands of kilos of cocaine. In contrast, in the case at bar according to Special Agent Perry there was only about $700.00 worth of meth found at the house. [TT#:789:11-18]

At trial Scarface poster became a focal point of the Government's case. It was mentioned <u>three times</u> by the Government during opening statements. [TT1: 213:17-19] [TT1:217:11] [TT1:221:9]; During the second day of trial Scarface was mentioned <u>two times</u> on direct by Detective Mui and Sergeant DeLima [TT2:364:21];[TT2:364:21]; During the third day of trial Scarface was mentioned <u>two times</u> on direct by Detective Gato [TT3:731:25] [TT3:733:4-5] During the fourth day of trial Scarface was mentioned by the Government during closing arguments a whopping <u>eight times</u>. [TT4:929:17] [TT4:939:25] [TT4:940:2] [TT4:940:4][TT4:948:18] [TT4:948:21] [TT4:949:1][TT4:970:14] Evidence and the highlighting of the Scarface poster was truly overkill that unduly prejudice Mr. Estadella.

## 404(b) Evidence (Extrinsic)

The rule 404(b) is "one of inclusion which allows [extrinsic] evidence unless it tends to prove only criminal propensity. The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite." *United*

*States v. Stephens*, 365 F.3d 967, 975 (11th Cir.2004) (quoting *United States v. Cohen,* 888 F.2d 770, 776 (11th Cir.1989))(internal quotation marks omitted).To be admissible under Rule 404(b), evidence of prior bad acts must withstand a three part test:

> (1) the evidence must be relevant to an issue other than
> defendant's character;
>
> (2) the probative value must not be substantially outweighed by
> its undue prejudice;
>
> (3) the government **must offer sufficient proof so that the
> jury could find that defendant committed the act**. [Emphasis
> added] *United States v. Ramirez,* 426 F.3d 1344, 1354 (11th Cir.
> 2005); see also *United States v. Beechum,* 582 F.2d 898, 911
> (5th Cir.1978) *(en banc)* (discussing these three prerequisites as
> part of a two-step test).

### The Ray Menace Rap Music Video

In its order regarding the Government's omnibus motion *in limine*, the Court determined that it would allow the Rey Menace (YouTube) rap music video to be introduced as evidence under 404(b). [DE:110:1] [MHT:20:8-25] [MHT:21:1-25]

In its Motion *In Limine,* [DE:72] the Government sought to introduce during trial as 404(b) evidence a music video produced by EB Music, titled "Anti Sapo"

Freestyle, Ray Menace (NY-rapper), Shot by 50cc Visualz, Directed by Isaiah Amir and Co-directed by Fred Scobar. The video is rated R. The video in question shows an empty (no bullets) magazine for AR-15 rifle next to the rapper Ray Menace[15]. Mr. Menace is holding a plastic toy pistol[16]. No real drugs or guns are feature in the video.

The music video of Ray Menace is not evidence of "any other crime, wrong. or and act…" Said music video does not provide proof of"…motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Not only is said video irrelevant to the crime charge, it is extremely prejudicial because a jury could be very easily be misled. The Government also needs to be mindful that when it makes an allegation of this nature that is able to back such allegations in good faith. Prosecutors have an "overriding duty of candor to the court" and the obligation under the Due Process Clause "to seek justice rather than convictions."*United States v. Foster,* 874 F.2d 491, at 495 (8th Cir. 1998) Allegation without proof should never be made. Even before assessing admissibility of the of 404(b) evidence, the judge must first determine whether the

---

[15] No empty AR-15 magazine was found in connection with this case.

[16] No investigation was conducted by the Government in this case Re: whether any crime committed in the filming of the video. Most importantly, the Government has never claimed or alleged that the plastic gun used and possessed by Ray Menace in the video was a gun involved in this case.

offense in question was actually committed[17] and whether a jury could reasonably conclude that the defendant committed the offense. *Beechum*, 582 F.2d at 912-13; see also *Huddleston v. United States*, 485 U.S. 681 (1988). The music video in question was produced and directed by a legitimate record company. No drugs, guns or bullets were used in the making of the video. The "Anti Sapo" video has been featured in U-Tube for years and has been watched by more than 18,000 people. It is just a rap music video.

For all the reasons and arguments stated above this Court should reverse the District Court's ruling regarding the Government's Omnibus motion *in limine* and remand this case to the District Court with instructions to grant a New Trial.

**ARGUMENT-6**

**THE CUMULATIVE EFFECT OF THE ERRORS DENIED APPELLANT HIS DUE PROCESS RIGHT TO A TRIAL THAT WAS FAIR**

The errors argued above either alone or combined, are cumulative errors that require reversal of Estadella's convictions. Under the cumulative error doctrine this Court "will reverse a conviction where an aggregation of nonreversible errors yield a denial of the constitutional right to a fair trial. *United States v. Reeves,* 742 F.3d

---

[17] In this instance whether any crime was in fact committed in the filming of the Ray Menace video.

487, 505 (11th Cir. 2014). The Court will assess cumulative errors "in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial" *Morris v. Sec'y. Dep't. of Corr.*, 677 F.3d 1117, 1132 (11th Cir 2012). Should Appellant's individual issues be considered harmless error, Appellant would tender that the cumulative effect of the errors at trial renders Appellant's convictions fundamentally unfair and violative of due process under the 5th and 6th Amendments, U.S. Constitution.

## CONCLUSION

Based upon the foregoing arguments and citations of authority, the Court should do as follows:

### ARGUMENT-1

1) Reversed and remanded this matter to the District Court with instructions to grant Appellant's motion to suppress;

### ARGUMENT-2

2) Reverse and remand this matter to the District Court with instruction to vacate the jury verdict as to Count-3 and enter a judgment of acquittal;

### ARGUMENT-3

3) Reverse and remand this matter to the District Court for a new trial;

### ARGUMENT-4

4) Reverse and remand this matter to the District Court with instruction to resentence the Appellant to a Base offense Level of 18.

## ARGUMENT-5

5) Reverse remand this matter to the District Court for a new trial.

## ARGUMENT-6

6) Reverse and remand this matter to the District Court for a new trial.


Respectfully submitted,

**Encinosa Law, P.A**.
**ISRAEL JOSE ENCINOSA, ESQ.**
F.B.N. 435007
8950 SW 74th Court, Ste. 2201
Miami, Fl 33156-3181
Tel. (305) 804-6976
Fax.(305) 203-4707
E-mail: encilaw@aol.com
encinosalaw@reagan.com


By: /s/ *Israel Jose Encinosa*
    Israel J. Encinosa, Esq.

**Certificate of Service**

I HEREBY CERTIFY that an original and 3 copies of the foregoing Brief for the Appellant was sent by U.S. Mail this **8th Day of July, 2024**, and that, on the same day, the foregoing brief was electronically uploaded to the Eleventh Circuit Court of Appeals' Internet web site at www.ca11.uscourts.gov. I hereby further certify that on the same date a true and correct copy of the foregoing Brief was mailed by U.S. mail to **Daniel Matzkin**, Assistant United States Attorney, Appellate Division, 99 N.E. 4 Street, Miami, Florida 33132.

By: /s/ *Israel Jose Encinosa*
Israel Jose Encinosa, Esq.
FBN 435007 64